UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br>THE RARITIES GROUP, INC.,<br>              Debtor. | Civil Action No. 08-11987-GAO<br>(Chapter 7 Case No. 03-11731) |
| JEFFREY D. STERNKLAR, Chapter 7 Trustee of Rarities Group, Inc., JEFFREY D. STERNKLAR, Chapter 7 Trustee of Martin B. Paul, and MARTIN B. PAUL,<br>              Plaintiffs-Appellees,<br>v.<br>HERITAGE AUCTION GALLERIES, INC., HERITAGE GALLERIES AND AUCTIONEERS, HERITAGE CAPITAL CORPORATION, HERITAGE AUCTIONS, INC., STEVEN IVY, and JAMES HALPERIN,<br>              Defendants-Appellants. | Adversary Proceeding<br>No. 08-01070 |
| | CONSOLIDATED |
| In re:<br>MARTIN PAUL,<br>              Debtor. | Civil Action No. 08-11989-GAO<br>(Chapter 7 Case No. 05-22881) |
| JEFFREY D. STERNKLAR, Chapter 7 Trustee of Rarities Group, Inc., JEFFREY D. STERNKLAR, Chapter 7 Trustee of Martin B. Paul, and MARTIN B. PAUL,<br>            Plaintiffs-Appellees,<br>v.<br>HERITAGE AUCTION GALLERIES, INC., HERITAGE GALLERIES AND AUCTIONEERS, HERITAGE CAPITAL CORPORATION, HERITAGE AUCTIONS, INC., STEVEN IVY, and JAMES HALPERIN,<br>            Defendants-Appellants. | Adversary Proceeding<br>No. 08-01069 |

OPINION AND ORDER
March 31, 2010

O'TOOLE, D.J.

The appellants, Heritage Capital Corporation, Heritage Auctions, Inc., d/b/a Heritage Galleries and Auctioneers ("Heritage"), Steven Ivy, and James Halperin, appeal from a denial of their motion to dismiss or stay the adversary proceedings in bankruptcy court in favor of arbitration. The proceedings before the bankruptcy court are identical actions brought by Jeffrey D. Sternklar (the "Trustee"), Chapter 7 Trustee for the bankruptcy estates of Martin B. Paul, a buyer and seller of rare coins and sports and entertainment memorabilia, and his company, The Rarities Group, Inc. ("RGI"). The Trustee asserts twenty-five claims of relief arising from a prior business relationship between Paul and Heritage, a collectibles auctioneer. Through its motion, the appellants seek to enforce arbitration clauses contained within various documents and to stay or dismiss the adversary proceedings. After careful review of the parties' briefs and accompanying exhibits, and after oral argument, the bankruptcy court's denial of the motion is affirmed in part and reversed in part.

**I.**     **Summary of Pertinent Facts**

The bankruptcy judge's memorandum of decision sets forth in careful detail the facts describing the long relationship between the parties, at least as alleged by the appellees, the Trustee and Paul, and it is not necessary here to repeat them in full. Sternklar v. Heritage Auction Galleries, Inc. (In re Paul), 399 B.R. 81, 86–97 (Bankr. D. Mass. 2008). A brief summary of facts pertinent to issues raised in this appeal, particularly as they relate to the content of a number of agreements executed by the parties, is sufficient.

Since the early 1980s, Paul and/or RGI participated as a buyer and/or seller in many transactions with Heritage, commonly in the context of auctions run by Heritage. Over their course of dealing, the parties agreed to numerous terms that would govern their relationship in a variety of writings, some more or less broad in scope, some limited to particular occasions. From

the record, however, it appears that it was the parties' invariable practice, whatever the transaction or the writing, to agree that any disputes arising between them would be settled by arbitration. The record contains many examples of such agreements:

*Standard Auction Terms*: Heritage's standard Terms and Conditions of Auction (the "Standard Auction Terms") applied to any participant in Heritage auctions, including Paul and RGI, as they acknowledged their assent to the Standard Auction Terms by participating in an auction or by registering online at Heritage's website. The Standard Auction Terms contained a broad arbitration clause requiring all disputes arising from or relating to any auction transactions, or auction-related property or agreement, to be resolved by arbitration in Dallas, Texas.

*Extended Payment Terms*: On February 23, 2001, Paul executed a document entitled "Extended Payment Terms for Dealers with Preapproved Credit" (the "Extended Payment Terms"). This was in connection with Heritage's 2001 February Long Beach Signature Sale, and it contained a similar arbitration clause.

*Consignment Agreement and Consignment Terms*: On March 19, 2002, Paul executed an agreement on behalf of RGI entitled "Auction Consignment Agreement" (the "Consignment Agreement"). This agreement specifically covered a Signature Sale on April 25–27, 2002. It included "General Consignment Terms and Conditions Auction Consignment Agreement" (the "Consignment Terms") that provided that "[t]he sale will be conducted in accordance with the Terms and Conditions of Sale that are printed in the Sale catalogue." (Decl. Paul Minshull Ex. A-5.)

*Invoices*: Four invoices with dates ranging between October 25, 2004 to May 28, 2005 were attached to the complaint and the motion to compel. Each indicates that the "Terms and

Conditions of Sale as they appear in the catalogue" apply to the transaction. (Id. Ex. A-4.) The standard terms included an arbitration provision.

*Terms of Sale*: A document titled "Terms & Conditions of Sale" ("Terms of Sale") is attached to an executed document titled "Central States Signature Sale & Internet Bullet Auction, April 25–28, 2002" (the "Bullet Auction Document"). The Terms of Sale includes an arbitration clause. (Id. Ex. A-7.) In signing the Bullet Auction Document, Paul acknowledged that he had agreed to the Terms of Sale.

*Participation Agreement*: On May 1, 2003, Heritage, Paul, and RGI executed a Participation Agreement, pursuant to which RGI, through Paul, would serve Heritage as an independent contractor. The agreement provided for a six-month term with automatic renewal. The agreement superseded "[a]ny and all prior agreements of the parties with respect to the subject matter thereof, whether oral or in writing," and it contained an arbitration clause agreeing that "any dispute arising pertaining [sic] to this Agreement or its termination, shall be resolved in Dallas, Texas, by final and binding arbitration . . . ." (Id. Ex. A-1, ¶¶ 18, 24.) It further provided that the agreement could not be modified or rescinded "except by an instrument in writing signed by the parties hereto or, in the case of an asserted waiver, by the party against whom the waiver is sought to be enforced." (Id. ¶¶ 4–5.) Finally, the agreement provided that all rights and obligations under it should cease upon its termination, "except as otherwise provided in . . . the [a]rbitration section" of the agreement. (Id. ¶ 4.)

*Oral Employment Agreement and Written Draft Agreement*: The Trustee claims that on February 7, 2005, Heritage and Paul reached an oral agreement whereby Paul would become an employee of Heritage, rather than an independent contractor under the Participation Agreement. The appellants dispute that a final agreement was reached. In any case, in early April 2005,

4

Heritage sent Paul a written draft of an employment agreement. This draft agreement was never executed. For present purposes, as evidence of the parties' practice and course of dealing, it is noteworthy that the draft contained an arbitration clause.

*Bill of Sale*: On September 30, 2005, Heritage and Paul executed an agreement titled "Bill of Sale." The parties disagree about the purposes of this agreement, and the Trustee claims that the Bill of Sale as produced by Heritage is incomplete and has been manipulated. In any event, regarding the parties' practices concerning arbitration, while the Bill of Sale as it appears in the record does not include a separate arbitration clause, it does refer to Paul's being bound by the terms of sale "to which [Paul] as an auction purchaser has agreed." (Id. Ex. A-3.)

The two bankruptcy cases involved here were filed about two years apart. On October 7, 2003, RGI filed a voluntary Chapter 11 petition, listing Heritage as the holder of unsecured debt. Heritage did not file a proof of claim. On February 14, 2005, the bankruptcy judge confirmed a plan of reorganization. On October 14, 2005, Paul filed an individual bankruptcy case under Chapter 7. In November 2005, Paul was terminated by Heritage. Heritage filed two proofs of claim in his personal bankruptcy case.

After his termination by Heritage, Paul found employment as a buyer for Rare Coin Wholesalers ("RCW"). At RCW, he made coin purchases at auctions, including those run by Heritage. In January 2006, RGI moved to convert its case to a liquidation under Chapter 7 because, according to Paul, he was unable to continue RGI's business in light of his full-time employment with RCW. The motion was granted on February 1, 2006.

On December 29, 2006, the Trustee filed motions in both bankruptcy cases seeking to retain special counsel to prosecute claims against Heritage on behalf of both debtors' estates. The Trustee claims that defendant Ivy forwarded a message to RCW that indicated that Paul would

not be permitted to participate in Heritage auctions as a result of the ongoing dispute between Heritage and Paul. Two days later, Paul was purportedly told by RCW that he was terminated because he was substantially less profitable to RCW if he could not participate in Heritage auctions.

On March 27, 2008, the Trustee commenced the present adversary proceedings by filing an identical twenty-five count complaint in each of the cases. The complaints allege tortious interference (Count I), promissory estoppel (Count II), negligent misrepresentation/employment agreement (Count III), deceit/employment agreement (Count IV), breach of contract/employment agreement (Count V), breach of contract/bill of sale (Count VI), breach of contract of various other agreements related to the consignments, auction purchases, split coin deals, and loans (Count VII), breach of the implied covenant and fair dealing (Count VIII), breach of fiduciary duty (Count IX), conversion (Count X), unjust enrichment (Count XI), an accounting pursuant to 11 U.S.C. § 542(e) (Count XII), wrongful termination (Count XIII), turn over order pursuant to 11 U.S.C. § 542 (Count XIV), preference pursuant to 11 U.S.C. § 547 (Count XV), fraudulent transfer pursuant to 11 U.S.C. § 548 (Count XVI), violations of the Uniform Fraudulent Transfer Act, Massachusetts General Laws chapter 109A, § 5(a)(2)(i), and Texas Business and Commercial [sic] Code § 24.005(a)(2)(A) (Count XVII), violations of the Uniform Fraudulent Transfer Act, Massachusetts General Laws chapter 109A, § 6(a), and Texas Business and Commercial [sic] Code § 24.006(a) (Count XVIII), unauthorized post-petition transfers pursuant to 11 U.S.C. § 549 (Count XIX), recovery of avoided transfers pursuant to 11 U.S.C. § 550 (Count XX), objection to the allowance of claims asserted or held by Heritage in the cases pursuant to 11 U.S.C. § 502 (Count XXI), equitable subordination of claims pursuant to 11 U.S.C. § 510(c) (Count XXII), violation of Texas Business and Commercial [sic] Code §

17.50 (Count XXIII), violation of Massachusetts General Laws chapter 93A, § 11 (Count XXIV), and declaratory judgment (Count XXV).

On April 28, 2008, the appellants, then defendants, filed in each case a Motion to Dismiss or Stay and Compel Arbitration and Alternative Motion to Dismiss Fraud Claims Pursuant to Rule 9(B). The Trustee opposed the motions. After hearing, the bankruptcy judge denied the motions on November 4, 2008. These appeals followed.

## II.     Discussion

The appellants broadly state the issue presented on appeal as "[w]hether the Bankruptcy Court erred as a matter of law in denying enforcement of the parties' valid and applicable arbitration agreement where there is no inherent conflict that 'seriously jeopardizes' the objectives and purposes of the Bankruptcy Code." (Br. Appellants 5.) More specifically, the appellants argue that the bankruptcy judge interpreted the arbitration agreement too narrowly when considering whether claims were covered and, if so, which claims; erroneously concluded that he had discretion to refuse to compel arbitration; and abused that discretion by refusing to compel arbitration.[1]

A district court reviewing a bankruptcy court's decision applies a clearly erroneous standard to findings of fact and *de novo* review to conclusions of law. Casco N. Bank, N.A. v. DN Assocs., D/B/A/ Atl. Motor Inn (In re DN Assocs.), 3 F.3d 512, 515 (1st Cir. 1993).

---

[1] The appellants also claim that the bankruptcy judge erroneously applied a Rule 12(b)(6) standard to the motion to compel arbitration and assumed the truth of the allegations in the complaint. They suggest that the judge should have applied a Rule 56 summary judgment standard instead. See Pelletier v. Yellow Transp., Inc., 503 F. Supp. 2d 397, 399 (D. Me. 2007); Boulet v. Bangor Sec. Inc., 324 F. Supp. 2d 120, 123–24 (D. Me. 2004). They do not appear to have raised the issue in the bankruptcy court (where they characterized their motion in part as a "motion to dismiss"). In any event, they do not suggest the result would have been different had the bankruptcy judge applied a summary judgment standard. Even under that standard, any contested facts would have been assumed in the non-movant's favor.

The Federal Arbitration Act ("FAA") provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. A court may stay a proceeding if an issue involved is covered by an arbitration agreement, id. § 3, and order "the parties to proceed to arbitration in accordance with the terms of the agreement," id. § 4.

The FAA established a strong policy in favor of arbitration. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). "The preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which the parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation, at least absent a countervailing policy manifested in another federal statute." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985). Statutory claims, like other claims, may be ordered arbitrated if the parties agreed to do so. Green Tree Fin. Corp.- Ala. v. Randolph, 531 U.S. 79, 89 (2000).

The FAA's mandate, however, can be overridden in limited circumstances. If Congress intended to preclude a waiver of judicial remedies for certain statutory rights, the FAA does not compel courts to enforce an otherwise valid arbitration agreement. Shearson/Am. Exp., Inc. v. McMahon, 482 U.S. 220, 226–27 (1987).

When faced with a question of whether to compel arbitration, then, a court must answer a two-part inquiry. The first question is whether the parties agreed to submit their claims to arbitration. Green Tree Fin. Corp., 531 U.S. at 90. If this question is answered in the affirmative, the court then must turn to decide "whether Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." Id. As to the first inquiry, the party seeking arbitration bears the burden of showing that a claim is covered by an arbitration

agreement. InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003). As to the second inquiry, it is the party resisting arbitration's burden to show that Congress intended to preclude it for the claim at issue. Green Tree Fin. Corp., 531 U.S. at 91–92.

### A.   Which Claims are Covered by an Arbitration Agreement?

It is the appellants' burden to establish that claims fall within the scope of a valid arbitration agreement, see InterGen, 344 F.3d at 142, but in tension with this burden, at least to some extent, is the federal policy directing courts to resolve doubts in favor of arbitrability, see, e.g., Jalbert v. Zurich Am. Ins. Co. (In re Payton Constr. Corp.), 399 B.R. 352, 358–59 (Bankr. D. Mass. 2009) ("[W]hile applying ordinary state-law principles of contract law and interpretation to discern the parties' intentions, the Court must, as a matter of federal law, resolve doubts in favor of arbitrability. Nonetheless, as in any contractual matter, the party seeking enforcement of the contract bears the burden of proving that the contract requires what that party is asking the court to enforce—in this instance, arbitration of the . . . matters in controversy.") (internal citations omitted). Addressing this tension, the First Circuit has explained that "[a]t bottom . . . federal policy merely 'guarantee[s] the enforcement of private contractual arrangements' by creating 'a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate.'" Combined Energies v. CCI, Inc., 514 F.3d 168, 171 (1st Cir. 2008) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625 (1985)). "Therefore, '[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." Id. (quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)).

An arbitration agreement generally lives on even when the agreement containing it expires, such that disputes over a provision of that expired agreement remain arbitrable. See

Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionary Workers Union, 430 U.S. 243, 255 (1977). The presumption that such a dispute is arbitrable "must be negated expressly or by clear implication." Id. A post-expiration grievance "arise[s] under the contract only where it involves facts and occurrences that arise before expiration, where a postexpiration action infringes a right that accrued or vested under the agreement, or where . . . the disputed contractual right survives the expiration of the remainder of the agreement." Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. NLRB, 501 U.S. 190, 205–06 (1991).

In this case, the parties repeatedly agreed to submit their disputes to arbitration. The record is replete with multiple independent agreements with broad arbitration provisions made over the years spanning the lengthy relationship between the parties. The Consignment Terms, Extended Payment Terms, Terms of Sale, Standard Auction Terms, and the Participation Agreement all provide for arbitration of certain disputes. The written draft employment agreement that purported to memorialize the parties' oral agreement also contained an arbitration clause. In every instance, the scope of arbitration was broad and inclusive. Even the Bill of Sale, which did not have an arbitration provision as such, referred generally to the fact that Paul was bound by the auction terms of sale, which did have an arbitration provision. The parties' intention to resolve disputes arising out of their relationship by resort to arbitration is unmistakably demonstrated by their consistent course of dealing in that respect.

The one claim in the present dispute that does not fall within the scope of the agreement(s) to arbitrate is the tort claim made by Paul personally against Heritage and Ivy for tortious interference with his employment relationship with RCW (Count I). That claim is distinct enough in its subject matter from the claims about the parties' buying and selling relationship that it cannot be reliably concluded that the agreement to arbitrate extended to it.

Subject to that one exception, however, the answer to the first question, did the parties agree to arbitrate their disputes, is yes.

B.  Would Arbitration of These Claims Inherently Conflict with the Purposes of the Bankruptcy Code?

The next question is whether the agreement to arbitrate should be enforced. The FAA, "standing alone . . . mandates enforcement of agreements to arbitrate statutory claims." McMahon, 482 U.S. at 226. However, "[l]ike any statutory directive, the [FAA's] mandate may be overridden by a contrary congressional command." Id. If the party resisting arbitration of a claim can meet its burden of showing that "Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue," a court has the discretion to deny arbitration. Id. at 227. The requisite congressional intent might be found in (1) the statute's text; (2) legislative history; or (3) "from an inherent conflict between arbitration and the statute's underlying purposes." Id.

There is no dispute that statutory text and legislative history offer no support for the appellees' argument that their claims are not arbitrable. Rather, the appellees argue, and the bankruptcy court agreed, that there was an inherent conflict between arbitration and the purposes of the Bankruptcy Code. To make its determination, the bankruptcy court employed the analysis developed by the Fifth Circuit in Insurance Co. of North America v. NGC Settlement Trust and Asbestos Claims Management Corp. (In re National Gypsum Co.), 118 F.3d 1056 (5th Cir. 1997).

National Gypsum involved a declaratory judgment adversary proceeding brought by successors to a Chapter 11 debtor against the debtor's liability insurer. The Fifth Circuit found that the bankruptcy court had acted within its discretion in denying a motion to stay in favor of arbitration. In re Nat'l Gypsum, 118 F.3d at 1058. In reaching that conclusion, the Fifth Circuit

noted with approval a Third Circuit decision which held that that matters involving debtor-derivative, non-core bankruptcy proceedings generally do not "'seriously jeopardize the objectives of the Code.'" Id. at 1066 (quoting Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149, 1160–61 (3d Cir. 1989)). However, it went on to decide that a bankruptcy court has the discretion to refuse to enforce an otherwise valid arbitration agreement when the underlying nature of a proceeding derives exclusively from the Bankruptcy Code, rather than from the prepetition legal or equitable rights of a debtor, and where the arbitration proceeding would conflict with the purposes of the Code, including "the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders." Id. at 1067, 1069.

By adopting the analysis of National Gypsum, the bankruptcy court rejected a binary distinction between core and non-core matters that other courts had applied. See, e.g., Brown v. Mortgage Elec. Registration Sys., Inc. (In re Brown), 354 B.R. 591, 603 (D.R.I. 2006) (finding that resolution of disputes in bankruptcy court for core proceedings, even when a valid arbitration clause exists, complies with the intent of the FAA, and a bankruptcy court must maintain authority to exercise discretion whether to enforce the arbitration agreement over core contract proceedings). The bankruptcy court found, just as the Fifth Circuit had in National Gypsum, see 118 F.3d at 1067, that though the core/non-core distinction was superficially appealing, ultimately it was too broad because not all core proceedings are based on provisions of the Code that would "inherently conflict."

Merely because a proceeding can be defined as "core" it does not follow that requiring the issues to be arbitrated would necessarily present an inherent conflict with the purposes of the

12

Bankruptcy Code under McMahon. The "core/non-core distinction conflates the inquiry set forth in McMahon . . . with the mere identification of the jurisdictional basis of the particular bankruptcy proceeding." Id. "Certainly, not all core bankruptcy proceedings are premised on provisions of the Code that 'inherently conflict' with the [FAA]; nor would arbitration of such proceedings necessarily jeopardize the objectives of the Bankruptcy Code." Id. Simply because a bankruptcy court *can* make a determination regarding a particular issue does not mean that it lacks discretion to compel arbitration of a dispute the parties agreed to arbitrate.

Conversely, for the same reasons, a bankruptcy court does not automatically lack discretion to refuse to compel arbitration of matters not involving core bankruptcy proceedings. Because the labeling of a particular proceeding as core or non-core does not necessarily signify whether there is an inherent conflict, non-core matters "should not, a *priori*, be channeled into arbitration without benefit of an inherent-conflict analysis." In re Payton Const. Corp., 399 B.R. at 362–63. It may be more difficult to find an inherent conflict with the Bankruptcy Code for non-core claims, see MBNA Am. Bank, N.A. v. Hill, 436 F.3d 104, 108 (2d Cir. 2006) ("[T]he presumption in favor of arbitration usually trumps the lesser interest of the bankruptcy courts in adjudicating non-core proceedings."), but it is nevertheless an inquiry that must be made.

For both core and non-core claims, then, a bankruptcy court must still analyze whether enforcing a valid arbitration agreement would inherently conflict with the underlying purposes of the Bankruptcy Code. This inquiry focuses not on the statute under which the various causes of action arise, but rather, on the subject matter that gives rise to the dispute that is otherwise subject to arbitration.

In this case, the Trustee is bringing claims based, for the most part, on prepetition transactions and contracts. The Trustee's fundamental claims are essentially based on Heritage's

13

alleged pre-bankruptcy wrongful conduct and breaches of agreements with Paul and/or RGI. Sorting out the business and property disputes underlying the adversary proceedings will be focused on the parties' respective rights and obligations under their pre-bankruptcy commercial relationship. While some of the claims invoke remedies explicitly made available by the Bankruptcy Code, there is nothing in the record that would suggest that the goals of the Code would be jeopardized by permitting the claims to be resolved in arbitration.

The bankruptcy judge's conclusion below that arbitration would interfere with the goals of the bankruptcy system was just that: conclusory. Drawing on the language of National Gympsum, see 118 F.3d at 1069, he said that arbitration would not serve "the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders." In re Paul, 399 B.R. at 109. But he did not spell out why those things would be true. Neither debtor is reorganizing, there is no plan to confirm, and liquidations of both estates started long ago. There do not appear to be any other creditors or third parties in these proceedings whose interests might be affected if the claims are resolved by arbitration rather than by a bankruptcy judge.

In short, it was an error for the bankruptcy judge to have concluded that enforcement of the parties' arbitration agreements would have necessarily conflicted with achieving the goals of the Bankruptcy Code. The established policy favoring arbitration in accordance with the parties' agreements should have been given effect.

**III.    Conclusion**

For the foregoing reasons, the bankruptcy court's denial of the motion to compel arbitration is affirmed in part and reversed in part. The case is remanded to the bankruptcy court to compel the parties to arbitrate all the claims in the complaints except Count I. Further proceedings in the bankruptcy court on the Trustee's complaints should be stayed pending conclusion of the parties' arbitration.

It is SO ORDERED.

   /s/ George A. O'Toole, Jr.
United States District Judge